This case is number 21-2251, Realtime Data LLC against Array Networks, Incorporated. When you're ready, Mr. Liddell. Thank you, Your Honor. Mr. Woodman, if I may? Thank you, Your Honor. And may it please the court, Brian Liddell for the appellant, Realtime Data. The patent claims at issue in this case, they claim technological solutions to technological problems rooted in computer technology and computer network systems. The claim solutions improve that computer functionality, and they're not abstract for that very reason. The district court did not even consider whether or not the claims were directed to a technological solution to a technological problem at step one of its Alice analysis, despite this court clearly indicating that that's a required part of the step one directed to analysis that was clearly established in Enfish and many other cases. Indeed, in Enfish, this court expressly explained that the step one analysis should consider this question, and that it was not merely a step two issue, as some had argued. The district court. Counsel, I think that if we were to ask ourselves, is a mere manipulation of data an abstract idea, the answer would probably be yes. What is it about this invention and its compression of data that makes it non-abstract? Thank you, Your Honor. I think, obviously, there are multiple sets of claims across seven different patents and three families. I'm going to generalize a little bit to answer your question, but there are obviously nuanced differences between each one. I think manipulation of data using compression is an incredible oversimplification of all of the claims here. The claims recite a solution for problems in data compression in which multiple different compression algorithms, compression encoders, are used in conjunction with one another based on a selection of which type of encoder is appropriate for which incoming data to improve the functionality and performance of the system. And that, depending on the patent, for example, in the first family, the 728 and 203 patents, the descriptor for the file is not to be the sole mechanism of identifying the data type. It's actually supposed to look at the content of the data. That was something that was a different way of approaching compression. So it's deciding whether to compress or not. Under the patent, the data can be sent out in the same form it was received, or it can be compressed into a data block. It's general. Now, do I understand this correctly that the decision, the algorithm, decides whether or not to compress into a data block based on the content of the data as opposed to its size? That's part of it, Your Honor. That's correct. It's not simply, though, so if we take the first family of patents, the 728 and the like, it's not simply whether or not to compress based on the content. It's actually how to compress based on the content. So some incoming data will be of a content type that- OK, so now focus on the how. I think the issue here for you is going to be the how. Sure. So you have a particular encoder. And again, I'm starting with this first family for simplicity's sake. You have a particular encoder that is associated with a particular data type. It's a good encoder for that particular data type that it can be recognized based on the content of the data. When the data that comes in fits that parameter, it goes to the encoder that's specifically good for that data type. When other data comes in, it's routed in a different direction to a different encoder that's a more default or generic encoder for compressing data that doesn't fit that data type. Because for many reasons, some encoders and some compression techniques are going to be better than others for different data types. That's very much a focus of these patents. It's a technological problem that the patents were addressing to use different encoders for the different data types to improve the throughput, improve the speed and compression functionality of the system, to use the compression in a new way to improve the throughput. So instead of just looking, for example, at the size or the compression ratio that a particular encoding technique uses, it's trying to pick which one's going to be good for which particular data type that's coming in. By the way, are we talking entirely within the universe of lossless compression or are the different compression options sometimes lossless and sometimes lossy? I believe that almost everything, I hesitate because there are about 211 claims. Right, you've effectively argued three. I understand. And yes, we are talking about different types of lossless compression in those systems, yes. The idea here is not about so much lossy compression where you're not able to reconstruct the original, but rather lossless compression and different kinds of lossless compression, which may be better or worse for different data types. Just to pick up on Judge Reyna's focus on this how question, one way to look at this matter is that, particularly as our case law has developed, it is not enough probably even at step one, but certainly at the combination, to say this is about a technological problem. And moving, if one wants to speak imprecisely, moving data from one place to another securely, reliably, and at speed is certainly a technological problem. The problem here is not that. The problem here is whether there is that minimum degree of specificity about a technique for doing that, that it's no longer abstract. Sure, so the problem here, to be clear, the technological problem here is not merely moving data faster. It's using, compression was a preexisting concept, but this patent, these patents as a group, each provide new ways to use compression in a new configuration and systems to improve its function to make those systems work better. So rather than simply using a single encoder for compressing all the data that comes in, some of which will be good and some of which will be bad, or using whichever encoder has the highest compression ratio, which might be a technique that one could try. These patents provide a new and different technique for how you basically choose the compression to be done. So the first one basically says, if you have the potential of a couple of different kinds of data, without relying entirely on a descriptor, choose a compressor that works, it doesn't even say better, but let's assume it says better for a particular kind of data. But it doesn't say we got a new compressor that does that. Why is that? Perhaps that's a little less abstract than saying use a compressor to send data. It says use a compressor that suits a particular kind of data on the basis of taking a peek inside the data file. Well, isn't that still abstract? I don't think it is, but I also don't think that's quite a fair summary of these claims. And in fact, I think this court actually said that's not a fair summary of these claims in its prior opinion, which from our perspective is the law of the case here. The court actually expressly criticized a formulation of choosing a data compressor based on the type of data as not being a fair characterization of these claims. Without reference to the tag? Well. Well, that would be true, but I mean. What the court said, Your Honor, was that choosing a compression method based on the data type, which was the district court's characterization. Right, but we're not talking about that. We are now talking about whether it is sufficiently specific to say, and this is just group one and probably group three also, but not group two. Correct. Choosing a compression tool to use based on the data where you look at not merely the descriptor of the data. So it adds something. It does add something. Does it add enough? I would suggest, first I would suggest that it is, but I would also add that the first family, for example, doesn't actually stop there because it's not pick one compression technique for the things you recognize. It's have a compression technique that is associated with a particular data type. Use that when the data coming in fits the criteria and use a generic or a more standard technique if it doesn't. What it refers to in the first group often is the content independent. So we have a default encoder for things that don't fit our parameters. We have an encoder that's fitted to parameters of at least some types of data and we analyze the data as it comes in and send it to one of those two so that what we end up with is a stream that's mixed types of compression to optimize the speed and the throughput of the system. That was entirely new. That was a completely different way of approaching compression and encoding than anything that had been done in the prior art. There's no showing here that that was conventional, that any of those things were well-known. There certainly was the case that compression standing alone was known, but combining compression encoders in this way to improve the system functionality was a completely novel and new approach to improving the functionality of the system that does, in fact, recite a very specific solution. Yes, it can be implemented in multiple ways, but that doesn't mean it's not a specific solution. It's certainly as specific as solutions that this court has found sufficient in cases like visual memory, in cases like EnFish, where, in cases like SRI, where there's a lot of high level to the claims, but they are describing an improvement to the technology and the functioning of the technology itself and that, at the directed to inquiry, that makes clear that the claim is not directed to an abstract idea, as this court has repeatedly held. And I would suggest that the district court's approach, if anything, stepped away from this court's caution not to overgeneralize the claims and, in fact, increased the level of oversimplification. The district court recited that all 211 claims of every one of those patents is directed to, and I want to make sure I quote this accurately, manipulating information using compression. That's at page 44 of the appendix. That's the district court's characterization of 211 different patent claims in seven patents, that every single one of them is directed to the app. There's no doubt that that's what we're looking at, manipulation of data through compression. But, you know, I asked you a while ago and I wasn't totally satisfied with your answer. Let me ask it this way. Certainly. When I go through the different asserted claims, the words that I'm focusing on, for example, data compression based on one or more parameters or attributes of the data within the data block, what does that mean? Is it reviewing the content? Yes. Well, why did you say it wasn't long ago? I mean, I think you walked your way away, yourself away from that. I'm sorry, maybe I misunderstood your question, your honor. So, okay. So when we're looking at the parameters or attributes, it says are the data within the data block. Yes. Or whether to compress the data block  There's decisions that are being made there and that's an algorithm, but what I need to know is what are those parameters and attributes of the data? What are we talking about? We're talking about the content of the data? Yes. Not the size. It's typically not going to be the size. So the patents specifications do address this in a number of places. The claims, for example, in the first family make clear that what you're looking at cannot exclusively be a file descriptor. So, for example. Well, what's the affirmative side? So the affirmative side, your honor, is that you would look at various different aspects of the data. So there might be. You gotta get to something more concrete and know what we're asking. Sure. So there are examples in the specifications. So there might be lots of repetition. There might be lots of redundancies in the data that might suit it to a particular encoder. There might be long strings of common characters that might suit it to a particular encoder. If we look at the, I'll use the 203 patent as an example, but if we look at the specification, there is a discussion about that kind of analysis and embodiments of doing that there in the figures, both figures 13A and B and figures 14A through D of the specification for the 203 patent. That's at pages 392 to 393 and 394 to 397 of the appendix. There's a discussion of that at column 15 through 20 of the specification. Examples of some of the type of parameters that you would look at are in column 16 of the 203 patent at page 417 of the appendix. Things like the data types, the structures, the data block formats, the file substructures, the file types, all of those are things that the patent describes as some of the kinds of parameters that you might look at in order to ascertain which encoder would be best. What does the structure of the data mean? So that can take some of the forms I mentioned, things like common repeating sequences or large portions that are present repeatedly. So for example, one type of lossless encoding that is often used is drawn as a kind of a dictionary encoding where strings of bits are represented by a smaller number of bits. So maybe I frequently have, if I use a more colloquial example, if I have many letters but a run of 10 letters occurs, maybe I have a single character or a couple characters that can represent that 10 and I know that that's the lookup for that 10 characters. Certain kinds of data have more susceptibility to that kind of encoding than others and so a dictionary encoder might be really good for that kind of data structure, whereas other data is much more randomized  So does that answer your question? If there's a block of data, a string of data that's just pure repetition, then you're saying that this invention would make a decision based on that? What does it do? I mean, it's gonna compress it or not. Well, but it's going to choose how to compress it with that information. So if it recognizes that and says that's a data type. You mean by the how? It'll just compress part of that? No. An example or representative of the repetition? Let's say I have one data block that comes in and the blocks can be of different sizes depending on the system, but I have a data block that comes in. That data block has a lot of repetition. I'm gonna send that to the encoder that's good for the repetition data. The next data block comes in and that doesn't have a lot of repetition. It's much more randomized. I'm gonna send that to the default encoder that doesn't work as well with repetition or isn't as efficient for repetition. That's the how. It's taking individual data blocks and compressing them differently depending on the content of the data and which kind of compression will work better for that particular data. Okay. Let's hear from the other side. I'm gonna save you rebuttal time. Thank you, Your Honor. Mr. Newcomb. Good morning. May it please the court. John Newcomb. I represent defendant Apelli Fortinet and I'm speaking today on behalf of all of the defendants Apellis. It's nice to be here in person. The last time I was before you was by Zoom and I have been regretting ever since that I mispronounced, Your Honor, Judge Toronto's name. It's happened before. It's been killing me ever since. I'm happy to proceed in whatever order makes best sense for the court. I propose to start with four topics. Number one is the specificity question which the court just asked my friend about. There's a very nice line in the Texact decision from 2016 where the court describes this analysis as quote, whether the line of specificity of solution has been crossed. It stuck with me because it's a bit of poetry from the court. The patentee can look to cases where the answer was yes. For example, McGraw. And we see there the court's repeated focus on the specificity of delineated rules which are repeatedly called limiting to the scope of the claimed invention. For my part, I can focus you on Racogna Court and the court's lack of finding of any specificity there. We can even find decisions where that same line of specificity is found to be crossed or not crossed for different claims within the exact same patent. For example, the court's data engine case in Google is illustrative there where you had, for example, one patent claim going for a very specific technical solution which was the use of a graphical user interface in a large 3D spreadsheet context. That was found to have crossed the line. And other claims, even within the same patent and families, that did not. Here. Why is this case not like McGraw? Where McGraw, we address the existence of very specific steps and rules that were in the claims. Why is this not like McGraw? When I look at, for example, a 728 patent and a 925, it talks about, again, about the parameters, the attributes, the encoder. It seems to lay out a roadmap that results in the data compression. So, as I read McGraw, the court had what I saw as a repeated focus on the specificity of the rules, the relation between the morph weight sets and the phonemes, which I'm probably now mispronouncing that name. It recurs throughout the opinion. The court talks about. In this case, we have reoccurring the words attributes and parameters, and that's almost in every single claim that we're looking at, and there's quite a few of them. It sure is, Your Honor. The difference, and it's a huge one, is that in this case, every time the patent uses, any of the patents, when they're using the technical jargon for an encoder or a decoder or a compression method, the patentee is uniformly clear that they are talking about compression techniques, and I'm going to get to parameters and attributes in just a moment. They are talking about techniques known in the art. When we talk about what the parameters or attributes are, it is claimed in an almost unbounded fashion. What those parameters or attributes are is only claimed in one partial negative limitation. It's in stark contrast, for example, to the SRI case, where right there within the claim limitations, you see a list of five, eight, 15 specific parameters that may be used. That was on the right side of the line of specificity. These are not, and when I say, I'll go one step further. Let's talk about what I'm calling the partial negative limitation that you can't look at exclusively the descriptor. That certainly does not get this patentee on the right side of specificity. That's for a couple of reasons. Number one, we actually just heard from my friend an admission. I don't have the exact timestamp. It was when there was about two minutes left on his clock in which the court asked him, what does it mean to be looking beyond the descriptor? Does that mean you're looking at the content? And the answer was yes. Well, that certainly doesn't get us to any level of specificity for a couple of reasons. Number one, we know from a CogniCorp and we also know from, well, we might not know, but I sure like the Judge Connolly decision explaining that choosing a compression algorithm based on the content of the data that is as old as two if by land, one if by sea, or choosing scientific notation for a large number by contrast using Morse code for language compression. Number two, we actually know from this patentee itself in the intrinsic record that content dependent compression is very well known in the art. I can read from the 825 patent column two, quote, there are many conventional content dependent techniques. From all seven patents, it says in the specification, it talks about how data can be parsed lexically, syntactically or otherwise, quote, using methods known by those skilled in the art. If I look at figure one for the data compression patents, it's actually described as a content dependent compression technique known to those in the art. Can you address visual memory, which in this case was here last time, was prominent, appears to be somewhat less prominent now, but why is that on the right side of the line? So I read visual memory, I think there are two ways I would distinguish visual memory. Number one is if we're going to talk about whether the problem is necessarily rooted or specifically rooted in a computer problem. Many panels of this court have used, of course, the mental process test or the pen and paper test. And that's why, for example, where Cognacourt fails because people can compress data in their brains. That's why you see the disagreement between the majority and the dissent as I read it in DDR about whether you can instantly transport somebody to a different brick and mortar store and you cannot, so it fails that test. In visual memory, if we're talking about problems inherent to a three tiered memory architecture, starting with the huge magnetic base, which is relatively efficient, but stores very slowly, then going to the main memory, then going up to the cache. That, the specificity of that problem being necessarily rooted in computer functionality, one cannot make an analogy to the way one can with this case or with others in terms of data compression. So that's problem number one to me, your honor. Number two is if you then read the, and I hate to get back to it, but that line of specificity of solution in visual memory, it is so markedly different than what we see in all seven of these patents. In visual memory, you're talking about a main memory plus the creation of three new cache memories, right? Your internal, your prefetch, your write buffer, plus you get programmable operational characteristics, and then the majority there says, just to buttress any further criticism, let's be clear, we also have 263 frames of computer code demonstrating how you can do that three crash programming. We take that level of specificity of solution and we compare it to these patents, where we can encode or decode using any technique known based on a parameter or attribute, but I won't claim in my claim language which ones that is, using general process, generic hardware, I would say rather than focus on visual memory, I would turn the court to not just for CogniCorp, but you versus Apple, which talks about using a hardware configuration of known components to engage in the manipulation of digital information. To enhance photo. Yes, to enhance photos, but. Without saying how, that was the. That's right, and of course there, the court also did that mental process test. Could I, it might be laborious, it might be hard, but could I take two pictures manually, find reference points, improve one by reference to the other, I could. That applies here, and of course, I would all the more so direct the court's attention to Voight, the 2009 decision. It's not precedential, but it's in the appendix, which goes straight to data compression and decompression, and yet using conventional compression techniques on generic hardware. Do you see any daylight between the three classes here? I do, and I think, I'm not a very good bench mind reader, but I think I may see the same distinction that I inferred from one of the court's questions. The middle tier of patents, what I call the data, the accelerated retrieval or storage, can't be saved with the, but you must look beyond the descriptor limitation. That's applying to the first three, which I'm calling the data compression patents, and then the seventh, the 751. I don't think adding that descriptor, which is, sorry, adding that descriptor of the descriptor, I don't think that adding a limitation that you must choose your compression method based on the content of the file and not just on the descriptor adds anything non-abstract. If anything, I think it could be supplanted with, don't judge a book by its cover, if we're gonna find a mental process for what's being claimed there. But there is that difference between them. Otherwise, I don't have anything to add beyond Judge Connolly's detailed, detailed discussion of individual claims, dependent claims in the May 2021 decision. What about Judge Love's decision? So for Carbonite and Action, a couple of thoughts on Carbonite. Number one, the Carbonite court did not have the benefit. That was in 2017 of the last five to six years of this court's precedent about how do we look for and find that line of specificity. So Magistrate Love did not have the benefit of reading Voight, which came out two years later. You versus Apple, which came out in 2021. Reading Voight might've taught the court that according to this court, that the quote rapid transmission of digital data by advanced data compression using generic components and conventional compression techniques, that that does not get you on the right side of an eligibility analysis. The court might've benefited from you versus Apple, which I've already discussed. Data Engine versus Google, which as I've mentioned, I think is an especially useful tool for district courts to find the difference between claims and how specific the solution is in the claim language. So that's number one. And that's obviously the most gracious and eliding answer to say that there's been subsequent case law. If asked respectfully to take Carbonite head on, I would tell you that the underlying information relied upon by that court does not support the conclusions drawn. I'll give you one example, maybe two, if the court's patience permits it. When talking about the 908 patent, I think of all of these patents and all of these claims, reading the 908 patent, claim one, gets you right there to abstraction and lack of specificity. But in reference to the 908 patent in particular, the Carbonite court found that it would, quote, improve a technological process by pairing data blocks with specific techniques, end quote. That's not from the patent, that's from the Carbonite decision. So that conclusion certainly sounds right and comports with this court's precedent on Alice issues. The problem is if you go read the 908 patent, it does no such thing. There's no specific data block that's identified in the 908 in the claim language. You don't mean that the conclusion sounds right, you mean that if those words applied correctly to the material, it would support a eligibility conclusion. That's right. That is a recitation of the law that if you get on the right side of the specificity line, you're gonna survive an Alice inquiry. But then the, quote, unquote, specific techniques that the Carbonite court mentioned, respectfully, I don't see them in the 908 patent. It can be any data block, it can be any compression technique. The claim simply describes using two compression techniques on two data blocks and making sure that what you get is a faster process than you would if it was. Well, it describes taking a data block that you compress and then running this thing through the rules again and compressing even further. That's a 908 patent. Well, I don't read, I mean, I'm thinking in particular of Claim 1, I don't read it to do that at all. As I read Claim 1 of the 908, it says, and I am maybe abstracting or summarizing, but you have two different data blocks, you have two different data compression techniques, you apply one technique to one data block and the other technique to the other data block. Now, as you read the claim language, it can be any data block, any kind of data, and it can be any conventional known-in-the-art compression technique. The only limitation is straight-up functional claiming, that when you do that, you'll know that you're within the bounds of the claim if you're now storing that data faster than if you wouldn't have used any one of those known-in-the-art compression techniques on any varieties of data blocks. I mean, I think if looking at the 908, the best one can do for specificity. Storing it faster is the object here because, well, not faster, but achieving data blocks that you can use quicker, that have more data in it, and yet you preserve bandwidth and some of these other things that are mentioned as a claim advanced here. I'm looking at the, okay, yeah, I'm looking at claim one of the 908 patent, and it seems to me that it takes what's already been done and makes it even, let's say, better. I'm still looking for the how, though, and that's why I invited you to take a look at this. Well, I'm gonna bring up the 908 with you. While I'm doing that, Your Honor, I can tell you that that faster limitation at the tail end of 908 claim one is an awfully good read on the discussion in Voight, the 2019 decision, in which the court recognizes that there is some specificity in that what is being claimed is, quote, faster compression, and yet the Voight court explains, rightly, I submit, that that's just an example of nonspecific functional claiming. Yeah, and I think if I take the court's question the way you intended it, looking at that last limitation, quote, the compression and storage occurs faster than the first and second data blocks are able to be stored on the memory device in uncompressed form, sounds great, noble aspiration. The question is whether there's a very specific solution and a limited, or I might say modestly claimed through claim language, solution that teaches you how to get there. Like those super defined, often relied upon definitional rules in McGraw. Or like in the SRI case, at least the patentee there said, if I'm gonna look at attributes, here's a list of, like the 12 which are within the scope. But we don't have anything like that anywhere else in the 908. I'm well beyond my times. Thank you, thank you counsel. Thank you, thank you for the court's time. Your very special time. Thank you, your honor. I did wanna return to, I think Judge Toronto, you asked about visual memory. And I do wanna disagree with my friend's characterization of visual memory. The claims there simply recited using a cache that was basically to perform better with the particular processor. It didn't recite in the claims the parameters to use or how to determine which way was better. It simply recited a technique in which at a very high level of generality, I would argue higher levels of generality than the claims present here, that you use these programmable caches to, in however they will work best with the processor to which they're connected. Didn't tell you how, didn't tell you in the claims any of those levels of specificity. And so to suggest that that's somehow more specific or more directed to a problem rooted in computer technology than the claims here, really doesn't wash with the decision that the court entered in visual memory. That those claims were, in fact, directed to a technological solution, to a technological problem. The same is true here. It's not merely the problem of we'd like to have. Can you just remind me, did Judge Connolly on remand here discuss visual memory? He references it, he basically, so the court had direct. The first opinion or the second opinion? It's in the first opinion, Your Honor. There were a number of things that this court had suggested he should consider. I know that was one of them. That was definitely one of them. I would basically say that all of them are addressed solely in footnote four, starting on page 48 of the appendix, actually concluding on page 48 of the appendix as well. That footnote purports to address all of the cases that the court suggested the district court should address in greater detail, as well as Judge Love's decisions, which the district court addresses with a single sentence that I disagree with those conclusions. We would submit that that does not comply with this court's directive to more carefully and robustly analyze those things. And frankly, the district court conceded that it wasn't really even looking at the technological solution question in the directed to analysis. At page 27 of the appendix, the district court basically disputes the premise that that's something it should consider at step one, and so indicates that it won't do so. And I think that's a clear error and clearly in contravention of this court's precedence. I also wanted to address this notion that the solution isn't, I think there was some colloquy about the second family and the storage claims relating to storage faster than. So it's not just part of what's important to remember about the way those claims are structured is that they recite using two different kinds of compression in a way that allows you to both compress and store the data faster than you can store the uncompressed data. So this patent was speaking specifically about bottlenecks that occur with the connection time and the response time of storage media. And that if you want to store compressed data, you have to keep that in mind. And so sometimes compression, the act of doing the compression, can take a very long time. And if the compression itself takes longer than it would take to store the data without doing any compression, then there's no savings. So the patent is directing and the claims are directing that you pick compression techniques that are essentially to optimize for that speed characteristic so that the storage, whatever reduction you're getting in terms of space, plus is enough to save you time in the storage, enough to offset the time you're spending doing the compression. And these patents don't add into the mix of comparison the required time for decompression on the receiving end, right? I believe, Your Honor, let me just double check my notes. I think that one of the three speaks a little bit more to decompression as well. But they're there. You haven't argued that that is a separate point, right? But I think in both instances, the point is you're picking which data blocks to send to which compressors all with that additional constraint in mind that how long the compression takes plus the storage has to be better than how long it would take to store without having any compression. So there's a time to store the data that's uncompressed. And there's an additive time of compression plus storing the presumably reduced compressed data. And so the storage time for the compressed data is less. But of course, you have the processing time to get it compressed. And the idea of those claims and the constraint that it imposes is you make sure that you're using the compression technique that doesn't eat up all the time savings that you've got from having smaller blocks of data that have to be stored. Unless the court has other questions, I know I'm past my time. Thank you. Thanks to both counsel. Thank you, Your Honor. The case is taken under submission.